IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br>ADAM STEPHENSON,<br><br>    Defendant. | No. CR12-3016-MWB<br><br>**REPORT AND RECOMMENDATION ON MOTION TO SUPPRESS** |

_____

Defendant Adam Stephenson is charged in an indictment with (a) knowingly distributing and attempting to distribute visual depictions of minors engaged in sexually explicit conduct, in violation of 18 U.S.C. §§ 2252(a)(2) and 2252(b)(1); (b) knowingly receiving and attempting to receive visual depictions of minors engaged in sexually explicit conduct, in violation of 18 U.S.C. §§ 2252(a)(2) and 2252(b)(1); and (c) two counts of knowingly possessing and attempting to possess visual depictions of minors engaged in sexually explicit conduct, in violation of 18 U.S.C. §§ 2252A(a)(5)(B) and 2252A(b)(2). *See* Doc. No. 2-1. Stephenson has filed a motion to suppress (Doc. No. 20) in which he asserts statements he made to law enforcement officers while being interrogated at his home on February 9, 2011, should be suppressed because he was not given *Miranda*[1] warnings before the interrogation. The plaintiff (the "Government") has resisted the motion (Doc. No. 24). The Trial Management Order (Doc. No. 7) assigns motions to suppress to the undersigned to conduct any necessary evidentiary hearing, and to prepare a report on, and recommended disposition of, the motion.

On June 21, 2012, the court held a hearing on the motion. Assistant U.S. Attorney

___

[1] *Miranda v. Arizona,* 384 U.S. 436 (1966).

1

Jamie Bowers appeared on behalf of the Government, and Stephenson appeared personally with his attorney, Michael Smart. The Government offered the testimony of Special Agent Robert Larsen of the Iowa Division of Criminal Investigation ("DCI") and Detective Jason Bahr of the Webster County Sheriff's Office. The following exhibits were admitted into evidence:

> *Government Exhibit 1*: a CD containing an audio recording of the interview conducted on February 9, 2011.
>
> *Government Exhibits 2, 2A, 2B, 2C and 2D*: photographs of the kitchen of the home, where the interview took place.
>
> *Joint Exhibit 1*: a typewritten transcript of the interview that was acknowledged by both counsel to contain some typographical errors but none of a substantive nature.

The motion is now fully submitted.

## BACKGROUND

On February 9, 2011, at approximately 11:30 a.m., seven law enforcement officers arrived at a home in Otho, Iowa, to execute a federal search warrant. The officers included Special Agent Larsen and Detective Bahr, one additional DCI agent, two officers with the Fort Dodge Police Department, and two deputies with the Webster County Sheriff's Office. All seven officers were armed and two were in uniform.

Stephenson lived at the residence with his parents, who were the owners of the home. Bahr knocked on the front door and Stephenson answered. Bahr advised Stephenson that he had a warrant to search the residence. Stephenson's initial response was to indicate that his parents were not home but would be home later. He then attempted to shut the door but Bahr stepped into the doorway to prevent the door from closing. Bahr advised Stephenson that the officers needed to enter the house immediately to execute the warrant. Bahr also provided Stephenson with a copy of the warrant.

Stephenson then stepped aside and allowed the officers to enter. Five officers entered the home while two remained outside.

Bahr directed Stephenson to sit on the couch in the living room of the residence while other officers secured the home. Bahr testified that it is standard practice when executing a search warrant at a residence to prevent occupants from moving freely about the house. This is to ensure that the occupants do not access weapons or attempt to destroy evidence. Bahr stayed with Stephenson in the living room while other officers conducted their initial sweep of the home.

Larsen then came to the living room and advised Bahr the house was secure. Bahr went outside to retrieve items from his vehicle while Larsen stayed in the living room with Stephenson. Larsen noticed that Stephenson was nervous and told him that he was not under arrest. Larsen did not tell Stephenson that he was free to leave.

When Bahr returned, he asked Stephenson if he would join Bahr and Larsen at the kitchen table to talk. Stephenson agreed and walked the short distance from the living room couch to the kitchen table. At this time, Bahr began recording the parties' conversation using a recording pen. Stephenson was not advised that the conversation was being recorded.

At the beginning of the recorded interview, Bahr stated[2]:

> "Ok, like I said, we're, um, not going to be any arrests made today, ok. You're, we're here just to execute a search warrant. We're here at the home we're going to talk to you right now since you're here. Maybe down the road here we'll ask, um, see if you maybe can contact your mom and dad to let them know."

Bahr then asked Stephenson to confirm that his parents owned the home, which he did. He also was asked his age and stated he was 18 years old. Bahr asked if he was in school

---

[2]All quotations from the interview in this order are based on the court's independent analysis of the recording (Gov't Ex. 1), not the typewritten transcript (Joint Ex. 1).

and Stephenson stated that he was a college student at Iowa Central (a community college).

After a couple of additional preliminary questions, Bahr stated: "As you can see you have a copy of the search warrant in front of you, um, we're after, the reason we're here is we're looking for, um, digital evidence, ok?" In response to this statement, Stephenson immediately stated something to the effect of: "I have to tell you that it's true . . . I have." Bahr asked: "What's true?" and Stephenson responded "I have looked at underage." Larsen asked: "Underage what?" and Stephenson stated "porn." Stephenson then stated, again, "It is true, I went through a phase."

Over the next thirty-five minutes, Bahr and Larsen asked Stephenson a series of questions concerning various matters relating to his involvement with child pornography, including details concerning picture trading websites, his user names and passwords for various sites, and the manner in which he became aware of certain sites. He also was asked to provide, and did provide, information concerning the computer and storage devices he used for child pornography.

All three parties to the discussion spoke calmly throughout. On several occasions, Stephenson volunteered additional information without being asked to do so.[3] Stephenson asked at one point if charges had been filed against him. Larsen responded that there were no charges at that time but that the officers could not promise what would happen in the future. Bahr later explained that the information from the investigation would be provided to the United States Attorney's office and that it would be their decision as to whether to file charges.

Stephenson was never physically restrained during the interview. The officers did make it clear, however, that he would not be allowed to access other parts of the house

---

[3]For example, when asked if he ever tried to touch a child inappropriately, Stephenson initially answered "no." He then volunteered that he "had thought about it," which prompted a series of follow up questions. Near the end of the interview Stephenson volunteered that he had accessed a website called "Guilty Groups" and asked if the officers had ever heard of it.

4

while the warrant was being executed. For example, he volunteered to show the officers where certain images were stored on his laptop computer but was advised that the officers could not allow him to do that. He also volunteered to "go get" a USB thumb drive that was stored in his bedroom but was told "no."

Stephenson never asked if he could leave, nor did he ask if he was required to answer questions. At no time during the recorded interview did Stephenson indicate that he wanted the questioning to end or that he was hesitant to provide information. Indeed, as noted above, he readily admitted "it's true" the moment Bahr explained the search warrant to him. Near the end of the interview, Stephenson told the officers that he was going to wait until they left to call his parents, as he wanted to talk to them when the officers were not present. Stephenson was not placed under arrest on February 9, 2011.

## DISCUSSION

Stephenson contends the statements he made to Bahr and Larsen on February 9, 2011, resulted from custodial interrogations conducted without his first being advised of his *Miranda* rights. The Government concedes Stephenson was not given the *Miranda* warnings, but argues that *Miranda* does not apply because Stephenson was not in custody when he made the statements.

Because Stephenson was never advised of his *Miranda* rights, if his statements were the product of a custodial interrogation, they would have to be suppressed. *See, e.g.*, *Oregon v. Elstad*, 470 U.S. 298, 309, 105 S. Ct. 1285, 1293 (1985) (*Miranda* requires that an unwarned custodial admission be suppressed); *United States v. Vega-Rico*, 417 F.3d 976, 981 n.2 (8th Cir. 2005) (Bye, J., concurring) ("Unwarned questioning is . . . a violation of the *Miranda* warnings designed to protect Fifth Amendment rights."). On the other hand, if Stephenson was not in custody when he made the statements, the statements should not be suppressed. Thus, the determinative question is whether

5

Stephenson was in custody when he made the statements.

As a preliminary matter, the court notes the burden of proof concerning the "in custody" determination is not clearly defined. As another district court in this circuit has observed:

> Some courts have placed the burden of proving that the defendant was not in custody at the time of the interrogation on the government. *See United States v. Charbonneau*, 979 F.Supp. 1177 (S.D. Ohio 1997). Other courts have placed the initial burden on the defendant to prove that he was "in custody," with the burden of proof shifting to the government to prove a voluntary waiver only after the defendant has sustained his initial burden. *See United States v. Moore*, 104 F.3d 377, 391 (D.C. Cir. 1997). The Eighth Circuit appears not to have addressed this issue yet, although some district courts within the circuit have. *See e.g.*, *United States v. Morriss*, 2006 WL 3519344 (W.D. Mo. 2006) (placing initial burden on defendant and citing to extra-circuit cases for authority).

*United States v. Sepulveda-Sandoval*, 729 F. Supp.2d 1078, 1097-98 (D.S.D. 2010). At the outset of the June 21, 2012, hearing the court asked both counsel to address the burden of proof. Stephenson's counsel took the position that the Government has the burden of proving by a preponderance of the evidence that Stephenson was not in custody during the interview. Counsel for the Government agreed. Based on the court's independent review of authorities addressing the issue, the court does hold that the Government has the burden of proving that Stephenson was not in custody.

A person is "in custody" when he is formally arrested or when his freedom of movement is restrained to a degree equivalent with formal arrest. *California v. Beheler*, 463 U.S. 1121, 1125, 103 S. Ct. 3517, 3520 (1983) (per curiam). "[W]hether a suspect is 'in custody' is an objective inquiry." *J.D.B. v. North Carolina*, 564 U.S. ___, 131 S. Ct. 2394, 2402 (2011). "Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate

the interrogation and leave." *Id.* (quoting *Thompson v. Keohane*, 516 U.S. 99, 112, 116 S. Ct. 457, 465 (1995)) (internal quotation marks omitted). "Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with formal arrest." *Id.* (quoting same); *see also United States v. LeBrun*, 363 F.3d 715, 720 (8th Cir. 2004) (en banc). "Rather than demarcate a limited set of relevant circumstances, we have required police officers and courts to examine all of the circumstances surrounding the interrogation, including any circumstance that would have affected how a reasonable person in the suspect's position would perceive his or her freedom to leave." *J.D.B.*, 131 S. Ct. at 2402 (internal citation and quotation marks omitted). "The test, in other words, involves no consideration of the 'actual mindset' of the particular suspect subjected to police questioning." *Id.*

In *United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990), the court identified six factors to consider in determining whether an individual is in custody for the purposes of *Miranda*:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

The first three factors tend to mitigate the existence of custody, while the last three tend to aggravate it. *United States v. Boslau*, 632 F.3d 422, 427 (8th Cir. 2011). "There is no requirement . . . that the *Griffin* analysis be followed ritualistically in every *Miranda* case." *United States v. Czichray*, 378 F.3d 822, 827 (8th Cir. 2004). "When the factors

7

are invoked, it is important to recall that they are not by any means exclusive, and that 'custody' cannot be resolved merely by counting up the number of factors on each side of the balance and rendering a decision accordingly." *Id.* "The ultimate inquiry must always be whether the defendant was restrained as though he were under formal arrest." *Id.* at 828; *see also LeBrun*, 363 F.3d at 720. "The most obvious and effective means of demonstrating that a suspect has not been 'taken into custody or otherwise deprived of . . . freedom of action,' is for the police to inform the suspect that an arrest is not being made and that the suspect may terminate the interview at will." *Griffin*, 922 F.2d at 1349 (alteration in original) (internal citation omitted) (quoting *Miranda*, 384 U.S. at 444, 86 S. Ct. at 1612).

After examining the totality of the circumstances in the present case, the court finds that Stephenson was not in custody on February 9, 2011, when he was interviewed by Bahr and Larsen. As such, the fact that *Miranda* warnings were not given before these interviews does not bar their admissibility.

The first factor is whether the suspect was informed during the interview that the questioning was voluntary, that he could ask the officers to leave, or that he was not considered under arrest. *Griffin*, 922 F.2d at 1349. Here, it is undisputed that Stephenson was informed at the beginning of the interview that he was not under arrest. Indeed, the recording of the conversation starts with Bahr's comment: "Ok, like I said, we're, um, not going to be any arrests made today, ok." This suggests that Bahr had previously advised Stephenson that no one would be arrested that day. Larsen testified that he, too, told Stephenson he was not under arrest while Stephenson was still in the living room. In short, the evidence shows that Stephenson was advised on multiple occasions that he was not under arrest.

Stephenson clearly understood that he was not being arrested. For example, he asked the officers if he could wait to call his parents until after the officers left. This

demonstrates an understanding that he was not going to be taken into custody at the conclusion of the interaction. And, in fact, Stephenson was not placed under arrest on February 9, 2011.

Nonetheless, Stephenson maintains his interview with Bahr and Larsen was a custodial interrogation because, although he was advised he was not under arrest, he was never told he had the right to end the interview, refuse to answer questions or consult with an attorney. "That a person is told repeatedly that he is free to terminate an interview is powerful evidence that a reasonable person would have understood that he was free to terminate the interview." *Czichray*, 378 F.3d at 826. However, the touchstone of the court's inquiry remains whether Stephenson was restrained as though he were under formal arrest, *see LeBrun*, 363 F.3d at 720, so the failure of Bahr and Larsen to inform Stephenson that he was free to leave and to refuse to answer questions is not dispositive. *See United States v. Flores-Sandoval*, 474 F.3d 1142, 1147 (8th Cir. 2007) (although defendant was not informed that he was free to leave, he had been released from jail and was free to leave, he voluntarily replied to the questions posed to him, and there was no evidence that defendant's responses were coerced through physical or verbal coercion; therefore, defendant was not in custody for *Miranda* purposes); *United States v. Wallace*, 323 F.3d 1109, 1111-14 (8th Cir. 2003) (defendant was not in custody for *Miranda* purposes even though she was told neither that she was free to leave nor that she did not have to participate in interviews with FBI); *see also Yarborough v. Alvarado*, 541 U.S. 652, 655-59, 663-65, 124 S. Ct. 2140, 2144-46, 2149-50 (2004) (where police initiated two-hour interview of suspect in police station, did not tell suspect he was free to leave, and engaged in "pretty friendly conversation" during interview, state court was clearly "reasonable" in concluding that suspect was not in custody). The first *Griffin* factor does not support a finding that Stephenson was in custody during the interview.

The second *Griffin* factor looks to whether the suspect possessed unrestrained

freedom of movement during the questioning. *Griffin*, 922 F.2d at 1349. Stephenson was neither handcuffed nor physically restrained during the interview, which supports a conclusion that he was not in custody. *See, e.g.*, *United States v. Muhlenbruch*, 634 F.3d 987, 995-97 (8th Cir. 2011); *United States v. Black Bear*, 422 F.3d 658, 662-63 (8th Cir. 2005); *United States v. Brown*, 990 F.2d 397, 400 (8th Cir. 1993). He does complain that he was initially ordered to sit on the couch before questioning began (and while the house was secured). He further points out that he was advised that he could not move freely about the house while the search warrant was being executed. The court finds that these limited restrictions on his movement were necessary for the safe and effective execution of the search warrant. Moreover, Bahr testified that Stephenson would have been permitted to leave the home if he had asked to do so. No evidence contradicts this testimony and, indeed, it is consistent with the undisputed evidence that Stephenson was not placed under arrest. The second *Griffin* factor does not support a finding that Stephenson was in custody during the interview.

The third factor identified in *Griffin* is whether the suspect voluntarily acquiesced to official questioning or initiated contact with authorities. "[W]hen the confrontation between the suspect and the criminal justice system is instigated at the direction of law enforcement authorities, rather than the suspect, custody is more likely to exist." *Griffin*, 922 F.2d at 1351. Here, there is no doubt that Stephenson did not initiate, and certainly did not desire, interaction with law enforcement on February 9, 2011. Stephenson was at his home when, without prior warning, seven armed police officers presented a search warrant and demanded entry. Stephenson's initial, reflexive response was to attempt to shut the door. However, the fact that Stephenson did not initiate contact does not end the inquiry, as the third *Griffin* factor also takes into consideration whether he "voluntarily acquiesced" to the questioning. *See United States v. Axsom,* 289 F.3d 496, 501-02 (8th Cir. 2002) (holding the district court erred by failing "to analyze the disjunctive prong of

10

the third mitigating factor—whether the defendant voluntarily acquiesced to requests by federal agents to answer questions."). The court finds that Stephenson did, in fact, voluntarily acquiesce to official questioning. As noted above, he immediately volunteered that he had "looked at underage" the moment Bahr described the search warrant to him. He then freely answered the officers' questions and volunteered information. The third *Griffin* factor does not support a finding that Stephenson was in custody.

The fourth *Griffin* factor requires the court to determine whether Bahr and Larsen employed strong arm tactics or deceptive stratagems during questioning. *Griffin*, 922 F.2d at 1349. The court has carefully reviewed the recorded interview and finds that no such conduct occurred. Bahr and Larsen were calm and professional throughout the interview. They did not raise their voices or physically or verbally intimidate Stephenson. *See, e.g., Brown*, 990 F.2d at 400. Nor did they use psychological ploys during the interview. They made no promises to Stephenson and admitted, when asked, that they could not tell him if he would be charged with a crime. They did not threaten Stephenson with adverse consequences if he failed to answer questions. Indeed, there was no occasion for them to even consider making such threats, as Stephenson freely answered their questions (and, as noted above, sometimes volunteered additional information). The court also finds the relatively-short length of the interview (36 minutes) to be important. *See United States v. Plumman*, 409 F.3d 919, 925 (8th Cir. 2005) (defendant not in custody although interview "lasted a considerable period of time, an estimated three and one-half hours without intervening breaks"); *Czichray*, 378 F.3d at 825-26 (defendant not in custody although interviewed at his home for nearly seven hours); *United States v. Helmel*, 769 F.2d 1306, 1320 (8th Cir. 1985) (defendant's interview was noncustodial because "it does not appear that any strong arm tactics were used. The period of questioning lasted some forty-five minutes to two hours, certainly not a marathon session designed to overcome [the defendant's] will."). Accordingly, this factor also weighs in favor of a finding that

Stephenson was not in custody during either interview.

The fifth *Griffin* factor requires the court to determine "whether the atmosphere of the questioning was police dominated." *Griffin*, 922 F.2d at 1349. In making this determination, the court examines such factors as the length and place of the interview. *Brown*, 990 F.2d at 400. Stephenson contends his interview was police-dominated due to the fact that seven armed law enforcement officers were at his home to execute the search warrant. Of course, "[any] warrant search is inherently police-dominated; there is nothing untoward about that circumstance." *United States v. Perrin*, 659 F.3d 718, 721 (8th Cir. 2011). However, the court finds it important that only two officers (Bahr and Larsen) were physically present while Stephenson was interviewed. There is no evidence that other officers stood in the kitchen in an attempt to create an intimidating atmosphere. Moreover, it is significant that the interview took place at Stephenson's own home (and at his kitchen table). The Eighth Circuit has stated:

> When a person is questioned "on his own turf," *United States v. Rorex*, 737 F.2d 753, 756 (8th Cir.1984), we have observed repeatedly that the surroundings are "not indicative of the type of inherently coercive setting that normally accompanies a custodial interrogation." *United States v. Helmel*, 769 F.2d 1306, 1320 (8th Cir.1985); see also *United States v. Wolk*, 337 F.3d 997, 1007 (8th Cir. 2003); *Axsom*, 289 F.3d at 502; *United States v. Sutera*, 933 F.2d 641, 647 (8th Cir. 1991). Even our court's one brief suggestion to the contrary, *see Griffin*, 922 F.2d at 1355 n. 15, also cited *Miranda* itself for the "accepted logic" that "an interrogation in familiar surroundings such as one's home softens the hard aspects of police interrogation and moderates a suspect's sense of being held in custody."

*Czichray*, 378 F.3d at 826-27. In short, while there was a substantial police presence in the home while the warrant was being executed, the atmosphere of the *questioning* was not overly-dominated by law enforcement. *Cf. Axsom,* 289 F.3d at 502 ("While nine persons participated in the execution of the search warrant, only two agents conducted the interview.") This factor does not support a finding that Stephenson was in custody.

The sixth and final *Griffin* factor is whether the suspect was arrested. *Griffin*, 922 F.2d at 1349. "Lack of arrest is a 'very important' factor weighing against custody." *United States v. Galceran*, 301 F.3d 927, 931 (8th Cir. 2002). Unlike the defendant in *Griffin*, Stephenson was not placed under arrest at any point during, or at the conclusion of, the interview. The court finds that this factor also weighs in favor of a finding that the interviews took place in a noncustodial setting.

As noted earlier, the *Griffin* factors are not exclusive. *Czichray*, 378 F.3d at 827. Instead, "[t]he ultimate inquiry must always be whether the defendant was restrained as though he were under formal arrest." *Id.* at 828. In this case, considering the totality of the circumstances, the court finds Stephenson was not in custody during the interview of February 9, 2011. Therefore, the fact that *Miranda* warnings were not given does not bar the use of these interviews at trial.

Accordingly, the undersigned finds Stephenson's statements should not be suppressed, and RESPECTFULLY RECOMMENDS that his motion to suppress be **denied**. Objections to this Report and Recommendation must be filed by **July 11, 2012**. Responses to objections must be filed by **July 18, 2012**.

IMPORTANT NOTE: Any party planning to lodge an objection to this Report and Recommendation must order a transcript of the hearing promptly, but not later than **July 3, 2012, <u>regardless of whether the party believes a transcript is necessary to argue the objection</u>**. If an attorney files an objection without having ordered the transcript as required by this order, the court may impose sanctions on the attorney.

**IT IS SO ORDERED.**

**DATED** this 27th day of June, 2012.

                                                          _____
                                                          LEONARD T. STRAND
                                                          MAGISTRATE JUDGE
                                                          UNITED STATES DISTRICT COURT